Nicholas O. Kennedy (State Bar No. 280504)
nicholas.kennedy@bakermckenzie.com
**BAKER & McKENZIE LLP**
1900 North Pearl Street, Suite 1500
Dallas, TX 75201
Telephone: 214 978 3000
Facsimile: 214 978 3099

Katharine Miner (State Bar No. 288083)
katharine.miner@bakermckenzie.com
Thomas Tysowsky (State Bar No. 330022)
thomas.tysowsky@bakermckenzie.com
**BAKER & McKENZIE LLP**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Telephone: 310 201 4728
Facsimile: 310 201 4721

Attorneys for Plaintiff
MING GLOBAL LIMITED

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MING GLOBAL LIMITED, a Hong Kong company, | Case No. **8:20-cv-01852** |
| Plaintiff, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR RIGHT TO ATTACH ORDER AND TEMPORARY PROTECTIVE ORDER** |
| MONARCH HOLDINGS INC., a Nevada corporation, d/b/a MONARCH INTERNATIONAL INC., and Does 1 through 10 inclusive, | |
| Defendants. | |

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA 90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

# **TABLE OF CONTENTS**

I.   INTRODUCTION……………………………………………………………1

II.  FACTUAL BACKGROUND………………………………………………...2

   A.   Ming Global's First Fraudulently Induced $20,000 Investment
      With Monarch………………………………………………………2

   B.   Ming Global's Second Fraudulently Induced $200,000 Investment With
      Monarch………………………………………………………………4

   C.   Ming Global's Third Fraudulently Induced $1,900,000 Investment With
      Monarch………………………………………………………………5

   D.   Monarch Failed and Refused to Return Ming Global's Funds As Promised
      and Fraudulently Induced Ming Global To Make a Fourth Investment of
      $10,000,000 In Order To Recoup Its Invested Funds…………………………6

   E.   Monarch Fraudulently Induces Ming Global to Pay Another $1,441,073.31
      In Additional Monies to Obtain a Release of Its Funds……………………6

   F.   Monarch Is a Sham Corporation Orchestrating a Fraudulent Scheme…….13

III. ARGUMENT AND AUTHORITIES……………………………………14

   A.   The Claim Is One On Which An Attachment May Issue…………………14

   B.   Ming Global Has Established The Probable Validity of Its Claim………..15

     i.   Ming Global Has A Valid Claim for Breach of Contract Against
       Monarch………………………………………………………..15

     ii.  Ming Global Has A Probable Validity of Prevailing on Its Implied
       Contract Claim Against Monarch……………………………...17

     iii. Ming Global Has A Probable Validity of Prevailing On A Common
       Count Claim Against Monarch………………………………...19

     iv. Ming Global Has A Probable Validity of Prevailing On An Unjust
       Enrichment Claim Against Monarch…………………………..20

   C.   An *Ex Parte* Right to Attach Order and Temporary Protective Order Is
      Necessary to Prevent Irreparable Harm from the Concealment or Transfer
      of Assets……………………………………………………………...21

     i.   The Statutory Requirements For A Writ of Attachment and Temporary
       Protective Order Have Been Satisfied…………………………22

     ii.  Ex *Parte* Relief Is Necessary to Prevent Great or Irreparable Injury….23

IV.  CONCLUSION……………………………………………………...24

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*C. Peacock, Inc. v. Hasko*,
   196 Cal. App. 2d 353 (1961) ...................................................................19

*Cavalry SPV I, LLC v. Watkins*,
   36 Cal. App. 5th 1070, 1081 (2019) .........................................................18

*Doud v. Jackson*,
   102 Cal. App. 213 (1929) .........................................................................18

*ET Publ'g Int'l Inc. v. Pac. Periodicals LLC*,
   No. CV 10-3108 DSF, 2010 U.S. Dist. LEXIS 152093
   (C.D. Cal. Oct. 13, 2010) .........................................................................19

*Fed. Deposit Ins. Corp. v. Dintino*,
   167 Cal. App. 4th 333 (2008) ...................................................................21

*G. Hirsch & Co. v. AmerisourceBergen Corp.*,
   No. C 06-00608 CW, 2006 U.S. Dist. LEXIS 32895
   (N.D. Cal. May 17, 2006) .........................................................................19

*Hamilton v. Greenwich Investors XXVI, LLC*,
   195 Cal. App. 4th 1602 (2011) .....................................................15, 16, 17

*Hernandez v. Lopez*,
   180 Cal. App. 4th 932 (2009) ...................................................................20

*Landry v. Marshall*,
   243 Cal. App. 2d 170 (1966) ....................................................................18

*Lectrodryer v. Seoulbank*,
   77 Cal. App. 4th 723 (2000) .....................................................................20

*Lewis v. Steifel*,
   98 Cal. App. 2d 648 (1950) ......................................................................15

*Lorber Indus. of Cal. v. Turbulence, Inc.*,
   175 Cal. App. 3d 532 (1985) ....................................................................14

ii

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA 94111
Tel: 415 576 3000

Case No.
DECLARATION OF VITALY SMAGIN IN SUPPORT OF EX PARTE APPL FOR WRIT OF ATTACHMENT

*Marvin v. Marvin*,
18 Cal. 3d 660. (1976) ....................................................................................17

*MH Pillars Ltd. v. Realini*,
277 F. Supp. 3d 1077 (N.D. Cal. 2017).........................................................20

*In re Palmdale Hills Prop., LLC v. Argent Mgmt., LLC*,
Nos. 08-bk-17206-ES, 1:16-ap-01120-GM, 2017
Bankr. LEXIS 2162 .......................................................................................21

*Ponti v. Farrell*,
194 Cal. App. 2d 676 (1961) .........................................................................19

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
No. 3:16-cv-05399-WHO, 2017 U.S. Dist. LEXIS 2999
(N.D. Cal. Jan. 6, 2017)..................................................................................17

*Santa Clara Waste Water Co. v. Allied World Nat'l Assurance Co.*,
18 Cal. App. 5th 881, 889 (2017)............................................................14, 20

*Snarr v. Cento Fine Foods Inc.*,
No. 19-cv-02627-HSG, 2019 U.S. Dist. LEXIS 220063
(N.D. Cal. Dec. 23, 2019)...............................................................................20

*Zhenua Logistics (H.K.) Co. v. Metamining, Inc.*,
No. C-13-2658, 2013 U.S. Dist. LEXIS 87089
(N.D. Cal. June 30, 2013)...............................................................................22

**Statutes**

Cal. Civ. Proc. Code § 481.190 ................................................................................15

Cal. Civ. Proc. Code § 483.010 .........................................................................*passim*

Cal. Civ. Proc. Code § 484.020 .............................................................2, 22, 23

Cal. Civ. Proc. Code § 484.090 ...........................................................................14

Cal. Civ. Proc. Code § 485.010 .............................................................2, 22, 23

Cal. Civ. Proc. Code § 486.010 ..................................................................2, 22

Cal. Civ. Proc. Code § 487.010 ....................................................................22, 23

iii

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA 94111
Tel: 415 576 3000

Case No.
DECLARATION OF VITALY SMAGIN IN SUPPORT OF EX PARTE APPL FOR WRIT OF ATTACHMENT

**Other Authorities**

Fed. R. Civ. P. 64 ................................................................................................ 2, 21

Fed. R. Civ. P. 65 ........................................................................................... 2, 22, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA 94111
Tel: 415 576 3000

iv

Case No.
DECLARATION OF VITALY SMAGIN IN SUPPORT OF EX PARTE APPL FOR WRIT OF ATTACHMENT

## I.      INTRODUCTION

Plaintiff Ming Global Limited ("Ming Global") was the victim of a fraudulent investment scheme by which it was deprived of $13,329,181.76.  Monarch Holdings, Inc. ("Monarch") and its agents concocted this elaborate scheme through a series of misrepresentations, broken promises, and breached agreements.  Monarch bilked Ming Global out of more than $13 million and, if Monarch had actually invested the money as it said it did, another $13 million in purported investment returns.  All of this money was transferred by Ming Global to Monarch's bank account in California.  Ming Global respectfully requests that this Court order Monarch to keep $13,329,181.76 in its bank accounts by freezing the money so it will be available to satisfy an eventual judgment.

In May 2020, Ming Global was contacted by an individual purporting to represent a prominent Hong Kong private equity firm, First Eastern Investments Limited ("First Eastern Investments").  After verifying First Eastern Investments' identity as a well-respected firm and in reliance on the promises made by Monarch, Ming Global began making modest investments.  All of Ming Global's contributions were sent to Monarch, the purported broker for U.S. trades in California.  After receiving assurances from Monarch that its initial investments were performing well, Ming Global invested millions more.  With the hook set on its unsuspecting victim, Monarch rapidly escalated a pressure campaign, forcing Ming Global to invest millions more to just recoup its original investments.

After Ming Global's repeated requests that Monarch return its money were met with increasingly convoluted and implausible excuses, Ming Global hired an investigative firm to research Monarch and its agents.  The investigation confirmed Monarch and its agents are not associated with First Eastern Investments, and that Monarch is a sham corporate entity.  Accordingly, and because the sums owed (including the original investment) still have not been returned, Ming Global filed suit against Monarch for claims that include breach of contract, breach of an implied contract, fraud, common counts for money had and received, and unjust enrichment,

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

1

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

seeking the return of its $13,329,181.76 stolen by Monarch.

Ming Global also has applied for an *ex parte* right to attach order and temporary protective order pursuant to Federal Rules of Civil Procedure 64 and 65 and California Code of Civil Procedure §§ 483.010, 484.020, 485.210, and 486.010 to prevent the dissipation, concealment, or transfer of assets necessary to satisfy an eventual judgment.  Monarch is a sham entity created by experienced fraudsters to receive the fraudulently procured funds.  Thus, there is a danger that the property sought to be attached will be concealed or otherwise made unavailable if issuance of the requested order were delayed until the matter could be heard on notice.  In other words, once Monarch knows its game is up, it will surely secret these millions to some unknown and unreachable offshore account.  This, of course, would destroy any possibility of recovery for Ming Global and render any judgment from this Court meaningless.

Because Ming Global's application, supporting affidavits, and arguments and other evidence satisfies the statutory requirements, Ming Global respectfully submits that a right to attach order and temporary protective order should issue on an *ex parte* basis to avoid the irreparable harm that would otherwise arise.

## II.    FACTUAL BACKGROUND

### A.    Ming Global's First Fraudulently Induced $20,000 Investment With Monarch

In early May 2020, Monarch's agents cold-called a Director at Ming Global, Sharath Kumar Hegde ("Mr. Hegde"), to pitch potential investments.  (Declaration of Sharath Kumar Hegde ("Hegde Decl."), ¶ 4.)   They told Mr. Hegde that they represented First Eastern Investments, a well-known Hong Kong investment firm.  (*Id*.) In reality, however, Monarch was not associated with First Eastern Investments and fraudulently made this representation to Mr. Hegde.

Shortly thereafter, Mr. Hegde received a call from an individual who referred to himself as "Alexander Mann."  (*Id*. at ¶ 5.)  But Alexander Mann is not believed to be the true name of the individual with whom Mr. Hegde spoke.  He is not employed with

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

First Eastern Investments, but instead is an agent of Monarch who used the false affiliation with First Eastern Investments to gain Mr. Hegde's trust. The actual identity of Alexander Mann is unknown at this time, as are the identities of Monarch's other agents.

After telling Mr. Hegde he was with First Eastern Investments, Mr. Mann told Mr. Hegde to "look them up". (*Id*. at ¶ 5.) Mr. Mann stated that First Eastern Investments was a private equity firm and that it offered investment opportunities with companies that would perform well. (*Id*.) Mann explained that First Eastern Investments received a 4% commission per transaction in exchange for its services. (*Id*.) Mr. Hegde inquired about the ability to take invested monies out of First Eastern Investments and Mr. Mann explained that funds could be remitted upon the client's request. (*Id*.)

Mr. Mann identified a few investment opportunities and asked if Ming Global would invest $20,000 for equity interests in two entities – BioNTech, SE (BNTX) and Novavax, Inc (NVAX). (*Id*. at ¶ 6.)

Specifically, Mr. Mann made representations as to the following material terms of the transaction: (1) First Eastern Investments would invest Ming Global's money in exchange for a 4% commission fee per transaction; (2) invested money would be returnable upon request by Ming Global; (3) the initial $20,000 was to be invested in purchasing the stocks BNTX and NVAX; and (4) Monarch was acting at the direction of and in concert with First Eastern Investments. (*Id*. at ¶ 9.)

Mr. Hegde, who is based in Australia, asked Ming Global's accountant at Asia Business Centre in Hong Kong for assistance. (*Id*. at ¶ 7.) The accountant confirmed that First Eastern Investments is a legitimate company and a respected private equity firm in Hong Kong. (*Id*.) Mr. Hegde's internet research on First Eastern Investments and its CEO, Victor Chu, who was also referenced by Monarch, confirmed the same. (*Id*.)

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

3

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

Based on the representations made by Mr. Mann, Ming Global agreed to invest the $20,000 with what it believed was First Eastern Investments for the purposes of acquiring equity shares in BNTX and NVAX.  (*Id*. at ¶ 8.)  Mr. Mann instructed that the payment be made to Monarch, which it described as the brokerage firm who would hold the funds and purchase the shares for Ming Global's investments. (*Id*.)  Mr. Mann then provided wire instructions to two separate bank accounts in Monarch's name, one at Bank of America and one at U.S. Bank.  Ming Global sent $20,000 to Monarch on June 3, 2020.  (*Id*. at ¶ 9.)

Ming Global later learned that the representatives were not associated with First Eastern Investments and, for the reasons detailed herein, believed that they are acting in coordination with and as agents of Monarch.  (*Id*. at ¶¶ 10, 36-40.)  As such, it was, in actuality, Monarch that was making the representations regarding the terms of the investment.  (*Id*.)

Subsequent to the investment, Monarch provided Ming Global with online account access through which Ming Global could see its stock holdings.  (*Id*. at ¶ 11, Exs. 1, 2.)  This account statement included the "First Eastern Investments Limited" logo.  (*Id*.)  The account statement also reflected Ming Global's name, Mr. Hegde's name, the amount of shares purchased, and current market price of the shares Monarch claimed to have purchased on Ming Global's behalf.  (*Id*.)

**B.    Ming Global's Second Fraudulently Induced $200,000 Investment With Monarch**

A few days after Ming Global's initial investment with Monarch, Mr. Mann contacted Mr. Hegde to tell him Ming Global's shares were performing very well.  (*Id*. at ¶ 12.)  He used this "good news" to set up an introduction between Mr. Hegde and "Scott Bailey", another purported representative of First Eastern Investments.  (*Id*.)  Scott Bailey is not associated with First Eastern Investments, but rather is associated with Monarch.  Scott Bailey appears to be another fake name.

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

In mid-June 2020, Mr. Hegde spoke with Mr. Bailey. (*Id*. at ¶ 13.) During that call, Mr. Bailey represented that he had another investment opportunity for Ming Global. (*Id*.) He asked for a $200,000 investment, this time for the purposes of purchasing equity interests in Anheuser Busch InBev SA/NV (BUD), United Continental Holdings, Inc. (UAL) and The Boeing Company (BA). (*Id*.) Because the prior small investment had seemingly done well (although no funds were returned), Ming Global believed Mr. Bailey's representation that this investment would be profitable as well. (*Id*.) Ming Global asked Mr. Bailey if the invested funds would be remittable upon the Ming Global's request and he stated that they would be and confirmed that monies would be invested pursuant to the same terms as those stated by Mr. Mann. (*Id*.) Ming Global thus transferred $200,000 to Monarch for this second investment opportunity on June 16, 2020 under the same terms and conditions that existed for the $20,000 investment. (*Id*.)

## C. Ming Global's Third Fraudulently Induced $1,900,000 Investment With Monarch

Around June 16, 2020, Mr. Bailey referred Ming Global to yet another purported representative of First Eastern Investments, his "boss" "Peter Lynd." (*Id*. at ¶ 14.) Like the others, Peter Lynd is not actually associated with First Eastern Investments, but rather is an agent of Monarch. Peter Lynd is believed to be a fake name.

Peter Lynd called Mr. Hegde shortly thereafter to solicit Ming Global's investment in "pre-IPO" call option shares in the company Royalty Pharma, PLC (RPRX). (*Id*.) Mr. Hegde specifically inquired again if my monies could be returned upon demand, and Mr. Lynd unequivocally responded that the monies could be. (*Id*.) Again, in reliance on Monarch's representations and because the prior investments appeared profitable, Ming Global made four separate transfers of funds totaling $1,900,000 to Monarch between June 17, 2020 and June 19, 2020. (*Id*.) Mr. Lynd confirmed this investment would be made under the same terms and conditions as the two prior investments. (*Id*.)

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

**D.    Monarch Failed and Refused to Return Ming Global's Funds As Promised and Fraudulently Induced Ming Global To Make a Fourth Investment of $10,000,000 In Order To Recoup Its Invested Funds**

In early July 2020, Mr. Hegde told Mr. Lynd that Ming Global wanted to liquidate its investments.  (*Id.* at ¶ 15.)  In response, Mr. Lynd told Mr. Hegde that Ming Global must actually invest *more* money before Ming Global could sell its RPRX shares.  (*Id.*)  Specifically, Mr. Lynd stated that if Ming Global invested an additional $10 million, the restricted shares (which could not be sold) would be converted to unrestricted shares (which could be sold) within three days (at a handsome profit), and Ming Global's investment would be returned within a week.  (*Id.*)  In reliance on this representation, Ming Global transferred an additional $10 million to Monarch between July 2, 2020 and August 11, 2020.  (*Id.*)

After Ming Global invested an additional $10 million with Monarch, Mr. Lynd stopped returning calls and emails from Mr. Hegde and other representatives of Ming Global shortly thereafter.  (*Id.* at ¶ 16.)  Ming Global became concerned by this lack of communication and Monarch's failure to return the money as agreed.  (*Id.*)

Ming Global was informed by Mr. Bailey that Mr. Lynd had suddenly gone to London, and that Mr. Bailey would again take over the account.  (*Id.* at ¶ 17.)  Then, on July 21, 2020, Monarch confirmed that Ming Global's recent transfers were received and that "once the payments that were transferred to us today have cleared you will be paid in full for your last trade."  (*Id.* at ¶ 18, Ex. 3.)  That statement was false and the monies were never returned as promised.

**E.    Monarch Fraudulently Induces Ming Global to Pay Another $1,441,073.31 In Additional Monies to Obtain a Release of Its Funds**

On July 29, 2020, Monarch required that Ming Global transfer additional funds in the amounts of $475,000 and $323,000 for what it called a "de-restriction fee", as a necessary condition before the money could be returned.  (*Id.* at ¶ 19, Exs. 4-7.)  After this payment, Monarch confirmed the funds would be returned in fourteen days: "In

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

answer to your query, yes you are absolutely correct.  It will be refunded within 10-14 days so I can confirm that." (*Id*., Ex. 4.)  This again was false.

On July 31, 2020, Monarch confirmed its agreement with Ming Global and told Ming Global that "the available cash is now $19,736,940.00.  As agreed with Mr. Hegde, our transfer agent will initiate the transaction at their earliest convenience, however please understand it will be New York morning time." (*Id*. at ¶ 20, Ex. 8.) This was false.  Despite the agreement to transfer the funds in the morning (Eastern Time) on August 1, 2020, the transfer of these funds (and sums due from subsequent transfers), has not been made.  (*Id*. at ¶ 21.)

Ming Global has repeatedly asked about the status of the promised transfer.  (*Id*. at ¶ 22.)  In response, Monarch provided an endless parade of ambiguous explanations and excuses for the delay, including purported "tax" and "regulatory issues." (*Id*.)  It also demanded that Ming Global supply additional documentation and pay additional money.  (*Id*.)  Seemingly left with no other option to receive its money, Ming Global complied.  (*Id*.)

None of Monarch's explanations for its delay in the release of funds have been supported by documents, despite Ming Global's requests for such support.  All the while, Monarch has repeatedly and clearly promised that Ming Global's money would be imminently returned.  (*Id*. at ¶ 23.)

Monarch's purported explanations, excuses, and false promises (which were made *in writing*) include, but are not limited to, the communications detailed below:

a. August 4, 2020  Email from D. Marie to A. Fung Re Trade Con: "The transfer was blocked by the tax department of the bank as they couldn't confirm Ming Global Ltd registered address." (*Id*., Ex. 9.)

b. August 10, 2020 Email from Z. Hegde to D. Marie Re Urgent: "We regret to inform you that Mr. Scott Bailey's personal margin for $250,000.00 has been rejected by the C.A.T.S, therefore there is still an outstanding balance which requires your immediate attention, as it needs to be settled before we can

7

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

instruct the transfer agent to finalise the repatriation of your proceeds." (*Id.*, Ex. 10.)

c.  August 11, 2020 Email from D. Marie to A. Fung Re CATS: "I have just been informed the funds will arrive no later than 10:00 am tomorrow morning as we must wait for the transfer Donna executed earlier today to clear in the account." (*Id.*, Ex. 11.)

d.  August 13, 2020 Email from Z. Hegde to G. Cowell Re Ming Global:  "I am awaiting on a confidential report from the US in reference to the transaction of your funds. The conversion of your account ownership from private to corporate is my suspicion and that of the compliance team here at First Eastern. Without this getting delayed any further, I have 'people' finding out also if this is a capital gains issue on the funds due to the above status of account having changed." (*Id.*, Ex. 12.)

e.  August 25, 2020 Email from Z. Hegde to G. Cowell Re Documents:  "I have made all necessary filings with regards to your case. As soon as we receive the written documents from the U.S., I shall send you and Donna a copy. We will be making ready all temporary funding required for the 'Stock Transfer Tax' on your behalf. Once this is completed, you as the receiving client will be reimbursed with your payment in full, which upon receipt may then be reimbursed to us." (*Id.*, Ex. 13.)

On August 14, 2020, Monarch asserted that it could not release the funds owed to Ming Global, now purportedly totaling approximately $26 million, unless Ming Global completed (and paid for) an Anti-Money Laundering ("AML") Certification. (*Id.* at ¶ 24.)  Ming Global once again agreed to Monarch's request so that the transfer of funds could finally be completed.  (*Id.*)  Ming Global and Monarch's agreement is documented in an August 14, 2020 Guarantee Letter, which states that "upon completion of an AML Certification [Ming Global] will receive a financial settlement in the amount of $26,683,540" and that Monarch will "proceed with remittance of the

8

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

funds . . . within a period of not more than 3 (three) business days." (*Id.*, Ex. 14.)  On August 14, 2020, Ming Global paid $643,073.31 for the AML Certification and provided it to Monarch.  (*Id.* at ¶ 25, Exs. 15, 16.)  Despite receiving the AML Certification, however, Monarch still refused to return Ming Global's money.  (*Id.*)

On August 27, 2020, Monarch sent Ming Global and its bank the following message:

> "WE ARE WAITING FOR THE EXACT DATE TO BE CONFIRMED WITH OUR OUTGOING TRANSFER DEPARTMENT. TAKE NOTE THAT PREVIOUS COMPLIANCE IRREGULARITIES HAVE BEEN A FACTOR IN TIME DELAY.
>
> ADVISE CLIENT THAT ACCOUNT IS CONFIRMED TO BE AML CERTIFIED.
>
> FURTHER WE CONFIRM THAT WE HAVE STILL YET TO RECEIVE ADDITIONAL NOTIFICATIONS OF REGULATORY INCIDENT REGARDING THE BENEFICIARY. WE WILL
>
> EXERCISE OUR COMPLIANCE RIGHT WHEN INITIATING REMITTANCE TO BENEFICIARY.
>
> ADVISE TO AWAIT SWIFT RECEIPT ONCE VALUE DATE CONFIRMED." (*Id.* at ¶ 26, Ex. 17.)

On August 31, 2020, after more than a month had passed since Ming Global first requested the return of the sums owed to it, Ming Global sent Mr. Bailey an email stating the following:

> "Scott, at this stage having no visibility or clarity is making lots of my investors nervous, including me. And as we all know nervous people are not good.
>
> The issue would have calmed down if we knew exactly what was going on and had transparency & visibility in paper work, but each time we hear its the "IRS, it's "BOFA", its trump etc which leaves us confused and nervous.

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

All we now ask for is to execute our Guarantee letter and ensure the funds are in our account within 2 business days as promised. Not much to ask for." (*Id*. at ¶ 27, Ex. 18.)

On August 31, 2020, Ming Global attempted to reach Monarch directly to inquire about the status of the transfer of funds. (*Id*. at ¶ 28.) Monarch did not respond to Ming Global's efforts to contact it. (*Id*.) But shortly thereafter, Mr. Bailey instructed Mr. Hegde that Ming Global should not contact Monarch directly and that Monarch will not respond to Ming Global's requests. (*Id*.) This reinforced Ming Global's belief that Monarch was simply a front for this scheme.

On September 2, 2020, Monarch sent a letter, purportedly from Victor Chu, CEO of First Eastern Investments, informing Ming Global that he could not release the funds because "the IRS believes there is a 30% withholding tax associated with the Ming Global trading account. This is of course absurd." (*Id*. at ¶ 29, Ex. 19.) Monarch then proposed a "20 day trading cycle" as a mechanism to resolve the purported regulatory issues. (*Id*.)

On September 2, 2020, Ming Global sent a response letter to Monarch addressing its failure to remit the funds:

"Upon your recommendation, advice and instructions, we paid a total of US $13,329,181.76 to Monarch Holdings Inc. for investment purpose. We have been expecting a financial settlement in the amount of US $27326613.30 (the "Outstanding Sum") from our investment since 16th August 2020. This is evidenced by the Letter of Guarantee issued by you in our favour dated 14 August 2020. However, there remains no indication as to when the Outstanding Sum would be paid to us. Your initial explanation was that the Outstanding Sum was in an account with Bank of America in Singapore which was somehow being restricted and thus could not be paid out. In your letter to us dated 2 September 2020, you seem to be suggesting that the Outstanding Sum is subject to 30% withholding tax by the IRS and therefore cannot be paid before this is

10

resolved. In the same letter, you seem to be further suggesting that the "regulators" (we do not know who they are) have concerns over our account. At all times, we have not been provided with any details or particulars concerning these alleged issues, or documents in support of the above purported explanations for the delay in payment of the Outstanding Sum." (*Id*. at ¶ 30, Ex. 20.)

On September 7, 2020, Ming Global followed up on the refund for the de-restriction fee that Ming Global paid on July 29, 2020, which Monarch had stated would be refunded to Ming Global within fourteen days. (*Id*. at ¶ 31.) Monarch responded with another unsupported explanation: "the de-restriction refund has been halted until we satisfy the bank regulators which is why we will be executing several trades over the next 2 weeks or so." (*Id*., Ex. 21.)

On September 14, 2020, Monarch advised Ming Global that it will be "initiating a further 4 trades tonight and a further 3 trades tomorrow, which will be a total of 15 trades throughout the trading cycle. This will be sufficient enough for us to proceed with the repatriation back to your Ming Global Ltd account. As agreed, once the first $15,000,000.00 has successfully cleared, we will discuss the location of remaining balance." (*Id*. at ¶ 32, Ex. 22.) However, as with each of Monarch's previous promises and representations, this was false. No funds were transferred to Ming Global. (*Id*.)

In sum, Ming Global has transferred $13,329,181.76 to Monarch. (*Id*. at ¶ 33, Ex. 23.) At all relevant times, Ming Global believed Monarch and the individuals acting on its behalf were actually acting on behalf of First Eastern Investments, and that all of the funds Ming Global invested were being properly managed by a sophisticated private equity firm. (*Id*. at ¶ 35.) This belief was based on the multiple statements made by Monarch and its representatives to this effect, as well as the numerous documents by which Monarch and its representatives claimed to be First Eastern Investments. (*Id*. at ¶ 34, Exs. 24-27.)

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Ming Global was wrong.  None of Monarch's agents were employed with or authorized to represent First Eastern Investments, and Ming Global's investments were not being managed by First Eastern Investments.  Instead, these individuals were working through Monarch to defraud Ming Global.

According to open source research recently conducted by an investigative firm:

a.  None of the identities of any of the individuals purportedly representing First Eastern Investments with whom Mr. Hegde interacted could be confirmed. These individuals do not have internet presences and therefore the names they provided are believed to be fake.  (*Id.* at ¶ 36.)

b.  Victor Chu, the founder and CEO of the real First Eastern Investments, confirmed that none of the parties with whom Ming Global has interacted are linked to him.  (*Id.*)

c.  The investigative firm also found discrepancies between the email address listed for First Eastern Investments on the Hong Kong Securities and Futures Commission ("SFC") registry, and the email address Monarch provided to Ming Global.  (*Id.*)

In addition, Monarch is a Nevada entity registered to do business in California. (*Id.* at ¶ 37, Ex. 28.)  Monarch's filings with the California Secretary of State list a sole corporate director, "Veronica So."  (*Id.*, Exs. 28, 29.)  Its filings list the address of both Monarch's office and it corporate director as 1625 N. El Camino Real, Unit B, San Clemente, California 92672.  (*Id.* at ¶¶ 37, 38, Exs. 28, 29.)  A small storage facility is located at this address.  (*Id.* at ¶ 30, Ex. 30.)  Monarch's website lists its California address as 33 Mistral, Aliso Viejo, California 92656.  (*Id.* at 39, Ex. 31.)   A condominium in a residential area is located at this address. (*Id.*, Ex. 32.) Additionally, Monarch is not registered as a U.S. securities broker on the Financial Industry Regulatory Authority's list of authorized securities brokers.  (Declaration of Nicholas Kennedy ("Kennedy Decl."), ¶ 4, Ex. 1.)

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

12

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

On September 15, 2020, a report regarding Monarch's transactions with Ming Global was filed with the Hong Kong police.  (Hegde Decl., ¶ 40, Ex. 33, 34.)  No action has been taken on that report to date.  Because the funds were transferred to California and held by a California entity, Ming Global seeks this Court's assistance to recover the millions that have been stolen.

### F.    Monarch Is a Sham Corporation Orchestrating a Fraudulent Scheme

As described herein, Monarch's agents – unknown individuals representing themselves to be Alexander Mann, Scott Bailey, Peter Lynd, Graham Cowell, Simon Newton, Victor Chu, and Angela Fung – falsely claimed they were investment advisers for First Eastern Investments.  (*See generally*, *id*.)  They also claimed Monarch is a U.S. securities brokerage firm authorized to trade U.S. securities, and that it would do so on Ming Global's behalf.  (*See id*. at ¶ 8.)  On the basis of these false representations, Monarch and its agents induced Ming Global to transfer millions of dollars to Monarch – which is actually a sham entity registered in California.  (*See generally*, *id*.)  Monarch is the holder of the wrongfully obtained $13,329,181.76, and is integral to the fraudulent scheme to swindle millions from Ming Global.

Based on the independent investigation finding no connection between Monarch's agents and First Eastern Investments, as well as the lack of internet presence for the names those agents provided, it is clear these individuals were not connected with the legitimate private equity firm First Eastern Investments as they claimed to be.  (*See id*. at ¶¶ 36-40, Exs. 28-34.)

As such, it is highly likely that Monarch is a sham organization operating an illegal plot for the purposes of defrauding Ming Global.  Unfortunately, this demonstrates starkly that Ming Global is highly likely to succeed on the claims it has asserted, some of which are discussed more fully below.

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

13

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

## III.    ARGUMENT AND AUTHORITIES

Attachment is a prejudgment remedy that allows a creditor to have a lien on a debtor's assets until final adjudication of the claim sued upon.  *Lorber Indus. of Cal. v. Turbulence, Inc.*, 175 Cal. App. 3d 532 (1985).  The Court may issue a right to attach order if it finds: (1) the claim is one on which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim upon which the attachment is based; (3) the attachment is not sought for any other purpose than to secure recovery on the claim; and (4) the amount to be secured by the attachment is greater than zero. Cal. Civ. Proc. Code § 484.090.

Moreover, a writ of attachment may issue if the claim sued upon is (1) a "claim for money . . . based upon a contract, express or implied"; (2) of a "fixed or readily ascertainable amount not less than $500"; (3) either unsecured or secured by personal property; and (4) a commercial claim.  Cal. Civ. Proc. Code § 483.010.

"The purpose of a writ of attachment is to ensure payment will be recovered if judgment is entered. [Ming Global] is only required to establish the 'probable validity' of its claims.  Whether [Ming Global's] claims are 'actually valid' is determined in a subsequent proceeding and not affected by the court's order on the applications for prejudgment attachment.  ([Cal. Code Civ. P.]§ 484.050, subd. (b)).  An attachment remedy would be useless if it required the court to first decide the merits and issue a judgment." *Santa Clara Waste Water Co. v. Allied World Nat'l Assurance Co.*, 18 Cal. App. 5th 881, 889 (2017).

Here, Ming Global has met all the criteria for issuance of a prejudgment attachment order.

### A. The Claim Is One On Which An Attachment May Issue

California Code of Civil Procedure section 484.090 requires that a claim is one on which an attachment may be issued, and California Code of Civil Procedure section 483.010 more specifically, requires that the claim is a "claim for money . . . based upon a contract, express or implied"; of a "fixed or readily ascertainable amount not less

14

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

than $500"; either unsecured or secured only by personal property; and a commercial claim. An attachment may stand for either a written or oral[1] contract and even an implied contract. *See* Cal. Civ. Proc. Code§ 483.010, subd. (a).

Here, the claim is a commercial claim for both a breach of contract and implied contract and is readily fixed at $13,329,181.76. The amounts are readily discernable from referencing the transfer of payments from Ming Global to Monarch.

### B.  Ming Global Has Established The Probable Validity of Its Claim

The "probable validity" requirement is satisfied "where it is more likely than not that the Plaintiff will obtain a judgment against the defendant on that claim." Cal. Civ. Proc. Code § 481.190. Here, it is more likely than not that Ming Global will prevail against Monarch on its claim for $13,329,181.76 based upon the parties' agreement concerning Ming Global's investments with Monarch.

### i.  Ming Global Has A Valid Claim for Breach of Contract Against Monarch

The essential elements of a breach of contract claim are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to plaintiff." *Hamilton v. Greenwich Investors XXVI, LLC,* 195 Cal. App. 4th 1602, 1614 (2011).

Through its Complaint and the Declaration of Mr. Hegde and accompanying exhibits, Ming Global has established a breach of contract claim against Monarch. (*See generally,* Hegde Decl.) While Ming Global was fraudulently induced to believe it was transacting with representatives of First Eastern Investments, in actuality, Messrs. Mann, Bailey and Lynd had no association with First Eastern Investments and were instead acting as agents for Monarch. (*See id*. at ¶ 36-40, Exs. 28-34.) Further,

---

[1] *Lewis v. Steifel,* 98 Cal. App. 2d 648 (1950) (Where plaintiff made an oral contract with defendants to serve as motion picture production manager for three motion pictures production of which would take approximately one year, at a salary of $500 a week, an attachment would lie upon a cause of action for damages for breach, since the damages were readily ascertainable by the reference to the contract and the basis of the computation of damages was reasonable and definite.)

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

Monarch is the entity which received the entirety of Ming Global's investment monies. (*See id.* at ¶¶ 9, 13-15, 19, Exs. 5-7.)

Ming Global entered into an initial agreement with Monarch, that was confirmed *vis a vis* a series of transactions, emails and letters between the parties. (*See generally, id.*)

Ming Global first entered into an agreement with Monarch in May of 2020 when it invested $20,000 of its monies. (*Id.* at ¶ 9.) Mr. Mann represented that the broker would take out a 4% commission fee per transaction, that the monies would be invested in in certain identified entities, that Monarch was the acting broker for First Eastern Investments, and the investment funds would be returnable upon Ming Global's request. (*Id.*) It was based upon these representations and the confirming representations of Messrs. Bailey and Lynd, that Ming Global made subsequent investments of $200,000 and $1,900,000. (*See id.* at ¶¶ 9, 14.) Monarch breached these representations by lying about its affiliation with First Eastern Investment and by failing to return the investment funds when requested.

Thereafter, Ming Global entered into an agreement with Monarch when it provided an additional $10,000,000 to obtain a return of its capital investment. (*See id.* at ¶ 15.) Monarch confirmed this in writing and represented that "once the payments [$10,000,000] that were transferred to us today have cleared you will be paid in full for your last trade." (*See id.* at ¶ 18, Ex. 3.) Monarch breached this agreement by failing to return the investment funds after it received the additional $10,000,000.

Lastly, Ming Global entered into an agreement with Monarch when it provided an additional $1,441,073.31 for de-restriction fees and an AML Certification. (*See id.* at ¶¶ 19, 24, 25, Exs. 5-7, 14-16.) In exchange for Ming Global's delivery of the AML Certification, Monarch agreed to swiftly return Ming Global's funds, as well as additional investment returns, within three days of receiving the AML Certification. (*See id.* at ¶ 14, Ex. 14.) Monarch actually represented that Ming Global would obtain remittance of its full balance of $26,683,540 and confirmed as such by way of a

16

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA 90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

Guarantee Letter[2] signed by Peter Lynd, Simon Newton and Graham Cowell on August 14, 2020.  (*See id*.)

### ii.   Ming Global Has A Probable Validity of Prevailing on Its Implied Contract Claim Against Monarch

An attachment may be granted if a party shows the probable validity of a claim based on a contract that is either express or implied.  Cal. Civ. Proc. Code § 483.010, subd. (a).  "The elements of a cause of action for breach of an express or implied contract are the same …: (1) the existence of the contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages." *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, No. 3:16-cv-05399-WHO, 2017 U.S. Dist. LEXIS 2999, at *12 (N.D. Cal. Jan. 6, 2017).  "An implied contract is one, the existence and terms of which are manifested by conduct."  *Id*. (citing Cal. Civ. Code § 1621); *see also Marvin v. Marvin*, 18 Cal. 3d 660, 678, fn. 16. (1976) ("an implied contract is "shown by the acts and conduct of the parties, interpreted in the light of the subject-matter and of the surrounding circumstances.").

Monarch may wrongly attempt to assert that *it* did not enter into any agreement with Ming Global, but rather, that all agreements were with First Eastern Investments.  Such an assertion would be both bold and nonsensical, especially given that it was Monarch that fraudulently represented it was First Eastern Investment.  (*See generally*, Hegde Decl.)  Regardless, Ming Global would still have an implied agreement with Monarch.

Monarch accepted Ming Global's money in exchange for its alleged investment services to Ming Global.  (*See id*. at ¶¶ 9, 13-15, 19, Exs. 5-7.)  Inherent in this implied contract is the obligation of Monarch to return the money Ming Global transferred to it when Monarch did not invest that money as promised and upon demand by Ming Global.

---

[2] While the Guarantee Letter is purportedly from First Eastern Investments, this was obviously a fraudulent representation.  In actuality, the representation was from Monarch.

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

The contract between Ming Global and Monarch is evidenced by Ming Global's transfer of $13,329,181.76 in exchange for Monarch's purported investment broker services.  *See Cavalry SPV I, LLC v. Watkins*, 36 Cal. App. 5th 1070, 1081 (2019) (". . . a party may accept a contract by conduct, as well as words . . .").  Ming Global's expectation that the funds be invested and, upon request, returned was the implied promise at the core of this contract.  Additionally, the parties executed a "Guarantee Letter," which is an independent written agreement promising Ming Global the return of even more—the $26,183,540.00 that included the purported investment returns.  (*See id*. at ¶ 14, Ex. 14.)  Monarch is not a registered securities broker in the U.S., has not purchased any securities, and has not returned any money.  (*See* Kennedy Decl., ¶ 4, Ex. 1.)  It therefore breached this contract.

This broken promise by Monarch to repay Ming Global's money after its failure to perform its obligation to invest Ming Global's money is at the core of the contract.  *See Landry v. Marshall*, 243 Cal. App. 2d 170, 176 (1966) ("It is well settled that when a sum of money has been paid pursuant to the terms of a sales contract and the consideration for the sale has entirely failed, the law will imply a promise on the part of the vendor to repay the money; and in such case an attachment will lie."); *see also Doud v. Jackson*, 102 Cal. App. 213, 218 (1929) ("The authorities appear to be uniform to the effect that where a sum of money has been paid upon a consideration which has entirely failed, the law implies a promise to refund it.").  "[A]ttachment will issue on such an action, to recover money paid under a contract, on failure of consideration even though there was no rescission by [P]laintiff."  *Landry*, 243 Cal. App. 2d at 176.

This court should accordingly grant Ming Global's *ex parte* application for a right to attach order and temporary protective order, to prevent Monarch's attempt to avoid the likely judgement it will face as a result of its actions.

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

### iii. **Ming Global Has A Probable Validity of Prevailing On A Common Count Claim Against Monarch.**

In addition to the contract claim, Ming Global will also succeed on its claim for common count of money had and received against Monarch. "Under California law, common counts for money had and received . . . are implied-in-law or quasi-contract claims that can support issuance of a writ of attachment." *ET Publ'g Int'l Inc. v. Pac. Periodicals LLC*, No. CV 10-3108 DSF (AJWx), 2010 U.S. Dist. LEXIS 152093, at *6 (C.D. Cal. Oct. 13, 2010). "California has three elements for a common count: (1) statement of indebtedness of a specified sum; (2) statement of the consideration; and (3) non-payment." *G. Hirsch & Co. v. AmerisourceBergen Corp.*, No. C 06-00608 CW, 2006 U.S. Dist. LEXIS 32895, at *6 (N.D. Cal. May 17, 2006) (citing *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445 (1997)). Moreover, "[a] common count may be used to recover money obtained by false and fraudulent representations . . . The action is one in assumpsit on an implied contract to repay the money received by the defendants." *Ponti v. Farrell*, 194 Cal. App. 2d 676, 679 (1961) (internal citations omitted); *see also C. Peacock, Inc. v. Hasko*, 196 Cal. App. 2d 353, 361 (1961) ("It is well established in our practice that an action for money had and received will lie to recover money paid by mistake, under duress, oppression or where an undue advantage was taken of plaintiffs' situation whereby money was exacted to which the defendant had no legal right.").

Ming Global's claim for common count of money had and received is simple. The amount owed is $13,329,181.76, the consideration provided to Monarch is the funds Monarch agreed to invest on Ming Global's behalf, and Monarch, without justification, has not returned the funds. (*See generally*, Hegde Decl.) Additionally, as discussed above, Ming Global's payment to Monarch was based on false and fraudulent representations, mistake, and was made under duress and oppression. (*See id.*) Lastly, Monarch exercised undue advantage over Ming Global by refusing to return Ming Global's money until Ming Global invested more and more money (which

19

it has not done even though Ming Global has invested all additional sums requested). (*See*, *e.g.*, *id*. at ¶ 15.)

It is thus likely that Ming Global will succeed on its claim for common count of money had and received.  This provides an independent basis for this Court to grant Ming Global's *ex parte* application for a right to attach order and temporary protective order.

### iv.  Ming Global Has A Probable Validity of Prevailing On An Unjust Enrichment Claim Against Monarch.

Ming Global is also likely to succeed on its claim for unjust enrichment.  Unjust enrichment "is an equitable claim that sounds in implied or quasi-contract."  *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017).  Therefore, demonstrating the probable validity of an unjust enrichment claim is sufficient to support a prejudgment writ of attachment even in the absence of a contract.  *See Santa Clara Waste Water Co. v. Allied World Nat'l Assurance Co.*, 18 Cal. App. 5th 881, 886 (2017) (". . . the unjust enrichment claim alone is sufficient to support an order for prejudgment attachments . . .").

"The elements of a claim of quasi-contract or unjust enrichment are (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense." *MH Pillars Ltd.*, 277 F. Supp. 3d at 1094; *see also Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (2000) (affirming jury verdict on an unjust enrichment claim).  "The doctrine applies where plaintiffs, having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value." *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938 (2009).  Monarch knowingly accepted Ming Global's money, unjustly retains that money owed to Ming Global, and does so at Ming Global's expense.

Monarch's unauthorized retention of Ming Global's $13,329,181.76 satisfies the "unjust" element of the unjust enrichment claim.  *See Snarr v. Cento Fine Foods Inc.*,

20

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

No. 19-cv-02627-HSG, 2019 U.S. Dist. LEXIS 220063, at *21 (N.D. Cal. Dec. 23, 2019) (restitution on the basis of unjust enrichment is available when "the benefits were conferred by mistake, fraud, coercion or request; otherwise, though there is enrichment, it is not unjust."). Ming Global transferred its funds to Monarch based on the fraudulent misrepresentations that the sums transferred would be invested and, upon demand, returned to Ming Global. (*See* Hegde Decl., ¶¶ 9, 13-15, 19, Exs. 5-7.) These circumstances make Monarch's retention unjust.

Further, even ignoring Monarch's participation and integral role in in the scheme to defraud Ming Global, Ming Global made its transfers on the mistaken belief that Monarch was a legitimate securities broker. (*See* Hegde Decl., ¶ 8; Kennedy Decl., ¶ 4, Ex. 1.) Even giving Monarch the benefit of the doubt that this was an honest mistake (which is most certainly not the case), a party "benefitting from a mistake of fact may . . . not be entitled to retain what amounts to a mere windfall." *Fed. Deposit Ins. Corp. v. Dintino*, 167 Cal. App. 4th 333, 347 (2008); *see also In re Palmdale Hills Prop., LLC v. Argent Mgmt., LLC*, Nos. 08-bk-17206-ES, 1:16-ap-01120-GM, 2017 Bankr. LEXIS 2162, at *34 (Bankr. C.D. Cal. Aug. 2, 2017) ("The California Supreme Court's statement of the law of restitution indicates that retention of a windfall (i.e., a benefit conferred on a party who had no legal right to that benefit) is unjust."). Simply put, it would be manifestly unjust to allow Monarch to keep Ming Global's 13.3 million dollars.

The unjust enrichment claim is likely to succeed. This provides a third independent basis to grant the requested *ex parte* application for a right to attach order and temporary protective order.

### C. An *Ex Parte* Right to Attach Order and Temporary Protective Order Is Necessary to Prevent Irreparable Harm from the Concealment or Transfer of Assets.

Federal Rule of Civil Procedure 64 allows this Court to apply California state attachment procedures to preserve assets for a future judgment. *See* Fed. R. Civ. P. 64 ("every remedy is available that, under the law of the state where the court is located,

21

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

provides for seizing a person or property to secure satisfaction of the potential judgment").[3]   The Court may also issue a temporary protective (or restraining) order to protect the status quo and prevent the transfer or concealment of assets by Monarch. *See* Fed. R. Civ. P. 65; Cal. Code Civ. P. § 486.010; *see also*, *e.g.*, *Zhenua Logistics (H.K.) Co. v. Metamining, Inc.*, No. C-13-2658, 2013 U.S. Dist. LEXIS 87089, at *12 (N.D. Cal. June 30, 2013) (granting right to attach order and TRO to prevent transfer of assets that may be used to satisfy an eventual judgment).

### i.   The Statutory Requirements For A Writ of Attachment and Temporary Protective Order Have Been Satisfied.

California law allows the Court to issue a right to attach order on a claim for a fixed or readily ascertainable amount of money based on a contract.  Cal. Civ. Proc. Code § 483.010(a).   The application for attachment must state the amount to be secured, that the attachment is not sought for an improper purpose, and that the claim has not been discharged or stayed by bankruptcy. Cal. Civ. Proc. Code § 484.020.  The application must also be supported by a declaration demonstrating that the plaintiff "on the facts presented would be entitled to a judgment on the claim," that the property is not exempt, and, for *ex parte* relief, that Ming Global "would suffer great or irreparable injury . . . if issuance of the order were delayed until the matter could be heard on notice." *Id.* § 485.210.

Ming Global has made this showing.  Concurrently herewith, Ming Global has submitted an Application for Right to Attach Order and Temporary Protective Order (the "Application") that satisfies these requirements.  Ming Global has also submitted concurrently herewith the Hegde Declaration and Kennedy Declaration, which attach the evidence referenced in this submission.  (*See generally*, Hegde Decl.; Kennedy

---

[3] Where the defendant, as here, is a corporation, the corporation's property is not exempt from attachment.  *See* Cal. Civ. Proc. Code §§ 484.020(e) ("all corporate property which is subject to attachment pursuant to subdivision (a) of Code of Civil Procedure Section 487.010" is appropriate for attachment), 487.010(a) ("Where the defendant is a corporation, all corporate property for which a method of levy is provided by Article 2 (commencing with Section 488.300) of Chapter 8), 488.455 (listing deposit accounts at financial institutions as available for attachment).

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Decl.)   As required by California Code of Civil Procedure section 484.020(e), the Application defines the property over which it seeks attachment: "all corporate property which is subject to attachment pursuant to subdivision (a) of Code of Civil Procedure Section 487.010," with specific reference to bank accounts.

These documents also establish that the claim is for a fixed amount of $13,329,181.76 and that the Application is based on different contract or quasi-contract claims independently sufficient to support a grant of writ of attachment.  They further confirm that the claim is not subject to discharge or stayed by bankruptcy and that the attachment is sought only to protect Ming Global's interest in restitution of its investment funds, and not for an improper purpose.

The evidence discussed herein also establishes that Ming Global is entitled to a judgment on it claim—namely repayment of its money under the terms of the parties' implied contract and restitution.  The Hegde Declaration describes the facts giving rise to Ming Global's breach of implied contract, common count for money had and received, and unjust enrichment claims.  (*See generally*, Hegde Decl.)

Therefore, the statutory requirements for a writ of attachment and temporary protective order have been satisfied and the requested relief should issue.

### ii.  *Ex Parte* Relief Is Necessary to Prevent Great or Irreparable Injury.

Ming Global is entitled to an *ex parte* grant of the relief sought in the Application to avoid "great or irreparable injury."  Cal. Code Civ. P. § 485.010(a); *see also* Fed. R. Civ. P. 65(b)(1).  Additionally, based on the Application and supporting materials "it may be inferred that there is a danger that the property sought to be attached would be concealed … or otherwise made unavailable to levy if issuance of the order were delayed until the matter could be heard on notice."   Cal. Civ. Proc. Code § 485.010(b)(1).

Monarch is a sham corporate entity registered to the address of a small storage unit in San Clemente, California.  (*See* Hegde Decl., ¶¶ 37, 38, Ex. 28-30.)  It purports

23

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA  90067
Tel: 310.201.4728

Case No.
PLAINTIFF'S MEMO IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TPO

1   to be a U.S. securities broker, but is actually operating a scheme to defraud

2   unsuspecting investors and abscond with their money. (*See* Kennedy Decl., ¶ 4, Ex.

3   1.) Based on the fraudulent scheme detailed herein and Monarch's baseless refusal to

4   return the funds, it is all but certain that delay until this matter could be heard on notice

5   would trigger another fraudulent transfer or concealment of Ming Global's

6   $13,329,181.76. Monarch's past actions demonstrate it has no qualms lying to and

7   defrauding Ming Global. And the complicated fraud it has already perpetrated

8   demonstrates that it has the means to hide this money if given the opportunity to do so.

9   (*See* Hegde Dec., ¶ 41.)

10      Therefore, *ex parte* relief is necessary to prevent great or irreparable injury to

11  Ming Global because there is a danger that the property sought to be attached would

12  be concealed if this application were made known to Monarch and heard on regular

13  notice.

14      **IV.    CONCLUSION**

15      For the foregoing reasons, Ming Global respectfully requests that the Court enter

16  an order granting the *ex parte* Application for a Right to Attach order and Temporary

17  Protective Order freezing $13,329,181.76 in any bank account held by Monarch, and

18  award Ming Global its costs and reasonable attorneys' fees along with all other relief

19  the Court deems just and proper.

20

21  Dated: September 24, 2020          Respectfully submitted,

22                                     **BAKER & McKENZIE LLP**

23

24  By: */s/ Nicholas O. Kennedy*
        Nicholas O. Kennedy
25      Attorney for Plaintiff
        MING GLOBAL LIMITED

26

27

28

Baker & McKenzie LLP
1901 Avenue of the Stars,
Suite 950
Los Angeles, CA 90067
Tel: 310.201.4728